Oyez, oyez, oyez. All persons having any manner of public business before the Honorable United States Court of Appeals for the Court of Service are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Mr. Teedy. Good morning, Mr. Chief Judge Gregory, and may it please the Court. My name is Derek Teedy and I represent the petitioners on this petition for review. In December of last year, the West Virginia Department of Environmental Protection purported to make a predictive judgment that the Mountain Valley pipeline could be completed without further water quality standards violations in West Virginia, notwithstanding the company's long history of such violations and the absence of any tangible evidence of water quality violations. Based on that prediction, DEP issued the Clean Water Act Section 401 certificate that's the subject of this petition. DEP's prediction, however, was not reasonable based on the record before it. For that reason, among others, DEP's certification was arbitrary, capricious, otherwise not in accordance with law, and this Court should vacate it. But I'd like to start this morning with the threshold question of whether the agency action was final, because the State, although not MVP, contends the certification was not final. The State is wrong. The State has confused the concepts of finality and effectiveness. A delayed effective date is not sufficient to render an agency action non-final. An agency action is final when the agency has completed its action and when legal consequences will flow. Here, the certification was final on its issuance. DEP said that it had completed its consideration of the application, and it shall become effective without any further action by DEP in 15 days. And legal consequences were also immediate. As the D.C. Circuit held an Alcoa Power Generating Inc. v. FERC, and that's at 643 F3D 963, a Federal agency is I'm not exactly clear why that sentence was in there. It may have been to allow time for the appeal to be filed. It happens to coincide with the opportunity to request an appeal. It is not required by State regulations. It is not present in every West Virginia 401 certification, yet it was present here. But regardless, as the D.C. Circuit has said, an agency action is not final. And a Federal agency can issue a license or permit upon the issuance of a certification, even if the certificate is not immediately effective. And the administrative review process to which the State points is irrelevant for these purposes. There is no requirement that administrative review be sought. Rather, it's discretionary. A person may seek a hearing. Moreover, that appeal is not as of right. The Secretary of DEP has the discretion, apparently from the regulations, the unfettered discretion, to decide whether or not to have a hearing. And most importantly, there is no stay in the interim. As the, you know, we can look to Federal finality doctrines for guidance here. The Federal APA provides that an agency action is final unless it is rendered inoperative during an appeal. That's what the Supreme Court held in Darby v. Narrows. And there is nothing in the State's regulations that would apparently even empower the Secretary to stay the effect of a certification pending the appeal. So for all of those reasons, this decision was final. Turning to the merits. DEP's finding that there's a reasonable assurance that the pipeline can be completed without violating applicable water quality standards is arbitrary and capricious because it was entirely implausible and internally inconsistent. The certification at JA56 says, without information demonstrating otherwise, the DEP relies on compliance with the requirements of its stormwater permit to control discharges from construction activities as necessary to meet applicable water quality requirements. Well, here there is information demonstrating otherwise. DEP found MVP had violated that stormwater permit when it was in active construction 139 times and committed nearly 50 water quality standards violations. Now, DEP nonchalantly says, well, it does not regard the number of violations its inspectors issued as surprising. But frankly, DEP defies logic when it says in one breath that MVP's compliance with the stormwater permit will prevent water quality standards violations and in the next says that MVP's violations of the stormwater permit are not surprising. Cut to the chase on what you are arguing here. Are you essentially saying there were past violations and now there are conditions, but there's nothing there to show that there would be no future violations based upon DEP's determination? Yes, that's correct. There are no new conditions. They speak of enhanced measures or more frequent inspections. Why is that required? Well, because it's arbitrary and capricious for an agency to make a predictive judgment and ignore the past. And that's the Bell South case that we cited in our reply brief. When you're making a predictive judgment, if the past actions are relevant to that prediction, well, then you must consider them and explain why this time it will be different. So is your problem, because they say they considered them, your problem is they didn't explain it? Well, it's unclear how closely they considered them because DEP, in response to comments about water quality standards violations in the past, DEP said, and this is at JA72, the subject of the current certification request is whether the information provided by the applicant satisfies the regulatory requirements. The previous actions of the applicant are not the subject of this review. So I don't think that DEP really took them seriously. So we're in a weighing situation when your opposing counsel gets up and he says, well, they did consider it and you've got to do predictive judgment on this here and this is what we do. And this is the way in which they undertook it was to make a predictive judgment here and you should maybe give some deference to this department in doing it. How do you respond to that? Well, deference is inappropriate when an agency action is inconsistent with the record below. And to the extent that DEP did consider the past violations and characterized them as minor, that is inconsistent with the administrative enforcement actions that DEP brought. So how difficult this would be if we sent it back for them to fix it? Do they simply just amend the record and say, well, we consider these violations and we consider that X, Y, and Z are here to protect against future violations? Does that cure it? I think it would take a reasoned examination of what MVP intends to do differently to ensure that violations do not recur again. But I'm really getting to, and I guess maybe I've just been up here too long as a judge, but I'm looking at the reality. Send this back. They go back in a room, relook at the record, and then enter these additional things that you think should be in the record. Does that cure it? It could cure it depending on what those things that they enter in the record are. If they provide a reasoned explanation for why things will be different this time. Can we look at the record in short circuit? Can we just look and say, let's look at this and see, do these things really show something there? I don't think that you can. I don't think that this was a harmless error because there were violations that occurred. DEP notes that several of them occurred at water crossings. One in particular is noted in the JA at 1862 where water quality standards violations occurred at stream crossings. We need to know what are they going to do to make sure that these violations do not occur again. And it's not enough to wave away the violation history. So I don't believe that it is harmless on this record. I don't think you can look at the record and see that MVP is doing anything new. All of the enhanced measures that they talk about were present in 2017. In the JA at 2129 to 2133, there are a series of construction plans that lay out what were called enhanced BMPs. And it's dated 2017. These were things that they had planned on doing from the get go and that it proved ineffective. And it's for that reason that the record wouldn't be sufficient to say that this error was harmless. So you make five arguments here on the merits. What are the top two? What are the top two? Well, the failure to, I love all my children equally, Your Honor. I only got six minutes to show my love today. I think this violation history argument is very, very important. I think also emblematic of the irrationality of the agency's argument is its reliance on EPA's position on upland construction. DEP said at least a half dozen times that it was relying on EPA's view that BMPs, best management practices, sorry for the acronym, protect water quality during upland construction to conclude that those best management practices will prevent water quality standards violations. In fact, DEP said it has first turned to EPA and its stormwater construction permit. The problem for DEP is that the permit on which it relies, EPA's construction stormwater permit, does not and cannot regulate Section 404 in-stream activities. To the extent that EPA guidance could be appropriate here, right? In fact, EPA's 401 regulations provide, they tell states, hey, we are available to consult on ways to predict whether or not water quality standards will be complied. If you have questions about how to apply your water quality standard or a particular project's impact, we're here. Pick up the phone. And those regulations were in effect under the old regime. The old regulation is 40 CFR 121.3. They're also in effect under the 2020 401 regulations. So the department says, at least in a brief here, that it just never believed that general permit applied to the in-stream construction. That's inconsistent with the certification itself is the problem. If you look at JA 65, on that page, DEP says that the EPA permit extends to both upland and water crossing activities. So its position in litigation that, oh, no, no, we knew that permit never applied, is inconsistent with the record, the certification itself. And so it seems to be a litigation position of sorts. And its reliance on EPA was repeated. It wasn't just an offhand comment or at least a half dozen times. So where is the inconsistency? The inconsistency is there. Where is it coming from? Is it coming from the same people? Or is it an intervener? Or is it the department? How does that inconsistency come about? Well, the inconsistency is their litigation position that, oh, we never thought that it applied to upland. With their words in the certification itself where they said that EPA's permit extends to both upland and water crossing activities. But as a matter of law, that permit cannot apply to water crossing activities. Those are Section 404. Is it really possible to engage in these water crossing activities, building this pipeline, without some water violations? I believe that it should. Or is it just the, all right, go ahead. I didn't mean to speak on your behalf. Or is it just the amount of violations that have occurred and continue to occur here that you really have a problem with? Well, we have a problem with both. We think one violation is too many. But in this case, we've seen nearly 50. But the Clean Water Act, as this court has held, is a strict liability statute. I believe it's the American Canoe case where this court held and has repeated since that it's standards, that strict compliance with the water quality standards are required. You haven't mentioned that there have been violations since this August 2022 violation that are the subject of 28J letters. Are you abandoning that we need to consider that? No, I do not abandon it. I think it shows, it is evidence that proves the falsity of the reasoned prediction, that there was some enhanced or new measure that was going to prevent future violations. Can you rule in your favor without considering the recent violations? I think that you can. I think that you can. But there was a point made by MVP in its response brief that violations had tapered off or ended by 2019. And this goes to show that that's not the case. That's not true. The violations are still occurring. And while we're speaking of the 28J, that comes to another point. The position has been that MVP responded to all of those violations immediately, I believe is the way that it's been phrased. But that's inconsistent with the administrative consent order where the penalties for multiple violations were enhanced because of the length of time that the violations persisted. And in both of the 28J responses, both MVP and MVP say that that August 11th one was immediately corrected. That too is inconsistent with the record. If you look at the inspection report for that violation, this is document 86-3 at page 1, the inspector wrote, it couldn't be clearer, not immediately corrected. So the excuses that DEP provides for the violations that occurred simply aren't supported by the record. Coming back to EPA just for a moment and their reliance on the EPA stormwater permit, it's remarkable that the agency, if it needed guidance from EPA, it could have reached out to EPA. Alternatively, it could have looked at EPA's comments on this very project. EPA reviewed MVP's application and provided comments to the Army Corps of Engineers in which they said, EPA, this is at JA 1067, EPA is concerned that the applicant has not yet demonstrated that the discharges from the project as proposed will not cause or contribute to water quality standards exceedances. The same agency that in DEP's view thinks that BMPs are a cure-all to protect water quality standards, on this very project and on MVP's very plans noted that it had concerns that water quality standards would be violated. DEP didn't look to that letter, didn't address that letter or the project-specific comments, and instead looked to the inapt stormwater construction permit. I see that I'm running short on time. I'll just briefly conclude that this court observed in 2018 in a case involving water quality that West Virginia has long resisted the requirements of the Clean Water Act. And we would submit that this is just the latest incarnation of DEP's resistance. If there are no further questions, I'll step down. Thank you. Thank you, Mr. Tini. Ms. C. Thank you, Your Honors, and may it please the Court. I'm Lindsay C. here today on behalf of the West Virginia Department of Environmental Protection. Of the many requirements for a complex project like the Mountain Valley Pipeline, Section 401 certification is an area where Congress has been clear that state discretion matters. It involves a state agency making highly technical assessments when applying state law. And here DEP took that role seriously. Over a ten-month process, it engaged with hundreds of comments, reviewed its own and other agencies' detailed assessments of the same project, engaged MVP's data, asked for more, and ultimately required a new detailed mitigation framework and 30 other special conditions before granting certification. You have these specific conditions that are included in this certification. The issue before us, it seems to me, the opponent has presented is are those sufficient? In other words, where is it in those conditions that stated that there is some intent to deal with future violations based upon past conduct? Certainly, Your Honor, I think it's important to look at two questions that the Department was engaging there. The first is whether the past violations was enough to say that no permit would be possible. And the second, was it irrational that the new conditions here would, in fact, deal with those? I can start with that second one since that's what Your Honor asked. Well, even with the first one, you say about the past, it's almost like you say in your brief, they were minor. But at least the consent of one is in the characterizing being major. Your Honor, I don't think that that is entirely fair with consent order, say, the same page that petitioners cite that talk about major deviations, talk about deviations from the permit. But that exact same table says that the potential for harm from those violations were minor to moderate. So even if we look at that consent decree itself, which, of course, is not acknowledging or admitting to any wrong, but even there the terminology shows that there was only potential for harm and it was minor to moderate. That is one of the ways that the EP looked at these past violations. Petitioner has recognized that it would be possible, even under their view, to grant a permit as long as the Department sufficiently engages with the conduct. Does the potential for harm matter? Certainly the potential for harm does matter, and that is a factor that the Department looked at. It looked at that as one of several factors. It looked at the number of violations here and said given a project of this complexity and how long it's been going on, the number was not surprising. It also looked at this Court's analysis in this first State Water Control Board case that says it is to be, quote, anticipated that there will be a number of minor issues from a project of this size. You said the numbers were not surprising. What is the metric of your tolerance? What we are looking at under the 401 regulation is whether there's reasonable assurance that the methods going forward would be enough to protect State waters, and that is what the Department said here. It looked at a number of factors that are going to protect West Virginia's waters. It looked at a separate operational oil and gas construction general permit, the enhanced site-specific best management practices that MVP gave and the Department approved there. It also looked at the new mitigation framework, which is something that did not exist at any earlier stage. What is the new mitigation framework? I think we can look at several factors in that mitigation framework. It's discussed starting around JA-128. That is a multi-step process where, first of all, MVP is required to have detailed site-specific baseline assessments for all of the particular crossings going forward. That's in addition to the site-specific assessments in the application. MVP provided that information in November 2021. The framework also requires there to be site-specific construction metrics and performance standards, and then to have continuous monitoring during construction, then ongoing monitoring for a period of three years to ensure that that actually occurs and that to support the Department's predictive judgment that any impacts would only be temporary. This is something that didn't exist at any earlier stage in the proceeding. But don't you limit the oil and gas effectiveness as to restoration but not necessarily ongoing trenching? Is that correct, the application? You specifically say it deals to the state of restoration, right? What about ongoing? Is that correct? No, certainly the mitigation framework is looking at restoration, and that's where the three-year monitoring comes in, but it's also looking at the particular conditions before any of the construction starts. There is, of course, inspections that occurs both during the active construction period, that's once a week while there's active construction, and then there's inspections that occur once every 14 days in the restoration period. So this is a comprehensive certification that looks at how construction activities take place as well as how restoration is, in fact, going for years to come. This is a question of what is enough, and these are highly predictive judgments that But doesn't that limit the application to looking at what they're doing while they're doing these things? It says restoration. Restoration wouldn't involve the blasting involved, the trenching. Why would West Virginia do that to protect this environment, the clean water? Well, West Virginia is certainly concerned about mitigation effects in the same way Virginia was, for instance, in the state water control. What you answer to my question is why would you restrict it to restoration and not being strictly compliant, being applicable to ongoing construction? Wouldn't there be a time where there would be quite a bit of potential damage when you're actually doing the blasting, doing the digging? Why wouldn't it be restoration? It specifically said to the extent it is involved in restoration, and that's language that West Virginia put in? West Virginia put that language into Well, why? Well, I want to be clear first that that is not the only thing that the certification is dealing with. There are many conditions and best management practices for construction. Oh, granted. That's granted. Well, answer my question if you can. So if I'm understanding it correctly Why did you put it was restricted to restoration? I'll put it a third time. Restoration and not the ongoing blasting and the trenching that's going to be done. That's just a simple question. We did not restrict the best management practices simply to restoration. Most of them do deal with the dewatering process, the blasting, the trench process. So many of the conditions, most of what takes place in the general construction permit all deal with that first part that Your Honor is talking about. It is true But most of those were already in place prior to this permit. So how are they enhanced practices when they were already in place? Many of them were These are not new things. Correct. And I want to clarify the enhanced practices language, that comes from the stormwater prevention permit, which, of course, did exist before. Those were enhanced best management practices that MVP submitted, the department approved, when originally giving registration under the certification. It's not irrational for the agency to say that some of those preexisting conditions and requirements would still help it have reasonable assurance going forward. Unless those things that were already in place had resulted in 149 violations already. So how are those things that were already in place, which resulted in all these violations, reasonable assurance that there won't be violations going forward? You have to look at the past as a predictor of the future. Yes, Your Honor, and the department is not disputing that. I think there's two important ways to look at that. The first is looking at those 149 violations. If we look at what the department said on JA69, it made several types of predictive judgments about them. JA what? JA69 is where that discussion starts. There the department looked at the number of violations, it looked at this court's reasoning and said the number we're talking about is not surprising given a project of this size and the years involved. It also then looked at the nature of violations. Petitioners have looked at that major language from the consent decree, but what they can't dispute is the department's finding that the overwhelming majority of these violations involved permit violations and had, quote, no aquatic effects. Now certainly the department is not tolerating permit violations, but that also shows the process is working how it's supposed to. The permit is a prophylactic system to make sure we're putting additional measures in place to make sure we don't have violations of state water quality. So of the 149 violations, how many had no aquatic effect? The certification does not give the exact number on no aquatic effect. Then how can you say the overwhelming number had no aquatic effect? That's what you just said. Yes, of course. I'm trying to understand what an overwhelming number is. Back to Chief Judge Gregory's question about West Virginia's level of tolerance for violations of its waters. Correct. There's no number for the no aquatic effect. The number we do have is there are 50 that were not simply straight permit violations. And in those cases we have circumstances where there may have been a discharge that went outside of the permitted disturbance levels or into state waters. But even those, as the consent decrees show, even in that smaller number, the potential for harm was minor to moderate. You know, when the opposing counsel brought it up, the fix of this situation is not difficult. At least from his perspective, it potentially could not be a difficult thing to do. When you have past violations characterized as minor or whatever, 149, some are not so minor it appears, and then you come back and you give the same certification with the same kind of protections, and what's missing is the explanation in the record as to how these conditions were specifically tailored to address the past problems. That was the question I asked the opposing counsel. Well, what do you do? You just send it back and the department, it seems like to me that's what you do. Just go back, look at the record, and I'll put you through this torturous argument of, well, these are just little minor violations and we'll just dismiss them as minor, which goes to say, well, we did all that. Why do we do all those other cases in here if they're just minor violations? When the simple fix is if you're going to impose conditions, then just indicate how they are tailored to fix the problem. And I think it's a language problem, and it may be that they can do it for the record. Maybe there's some way to do it, but don't you think that if ultimately it does go back, this should not be a difficult matter to resolve? I do agree with that, Your Honor. Let me take a run at explaining why there are new conditions here. I think if this is a matter of lack of explanation, we would disagree with that. There's no question you've got new conditions. What you don't have is the explanation as to why those conditions are specifically tailored to address the past problems. That's the line we're drawing here. At least me, I'm trying to understand where is that? And, you know, counsel can look back, you know, 50-50, go back and say, well, we see we could have done this. Well, at least it seems to me that's a pretty easy fix. Either do it or they can say we did it or we didn't do it. Your Honor, I do agree that in the particular portion of the certification response to questions on past violations, it doesn't specifically tie the new conditions there. I agree with that. I also agree that it would be an easy fix, and I think that would be a reason not to reverse because as this Court has said in the Roe v. DoD case, as long as the agency's path can be reasonably discerned, that's enough for a reasonable explanation. Not to reverse, but to remand. Correct, yes, yes, to remand. And I think we can reasonably discern that path here. If we look to the other portions of the certification that talk about the new conditions, we can look at a couple of them, for instance. Something that's new is Condition 2 that talks about the requirement to look a half mile upstream for all intakes. Condition 4 puts more specifics on the details for revegetation and allowable and disallowed materials. We have a number of new conditions here that are specifically addressed to make sure that we do not have violations of state water qualities going forward. You say that. That sounds good. What does the Department say? Your Honor, the Department does say that in the conditions. It imposes the conditions, and it says that that is necessary in order for it to have reasonable assurance that there will not be violations going forward. If what the court is looking for is the magic words that say, and because of these conditions, that's why we think that we have confidence in the light of... What is Condition 4? Does that go to restoration, revegetation? Some of that goes to restoration, but it also looks at the particular materials that are allowed to be used during construction. So, yes, we do have a mix of conditions. Such as? As you know, I have Condition 4 right here. It talks about certain types of metals that are not allowed to be used because they're more likely to leach into the water system. It gives it an illustrative but not exhaustive list of materials that can and cannot be used. So that's what that particular condition was for. Materials used for what operational? Materials used for the construction process itself. So we're talking about both construction and mitigation. The Department was very concerned about both of them. What introduction of metals? You made that example. What introduction of metals that you're protecting that would assure no violations in that area? Well, some of these are dealing with best management practices. We want to make sure that when the water is restored back to the original stream bed that there's not going to be an introduction of harmful materials to the water system. That's one example. Isn't that a post-construction matter? You're not talking about the actual materials they use to dig. We are in that provision but there's many others that are dealing with those as well. So that's only one example here. But yes, we're looking at some of the materials used in the actual construction process. In blasting? When you say things like that I'm just trying to get to the nub of it. What materials would be introduced in the blasting and the digging that you now have made sure that those metals will not be introduced? Just tell me what that is. I think I understand the confusion. I'm not talking about the materials for the blasting itself. For constructing the pipeline itself. So some of the process that's used in laying the pipeline and in isolating the area to make sure that there's not going to be any introduction of harmful materials. But again, this is one of the many conditions we have here. Most of the ones that we're relying on were of course in the original construction general permit. We do have many best practices that not only DEP but FERC and the vast majority of peer-reviewed studies have shown are highly effective when it comes to this sort of construction activity. I think it's important not to lose sight of that. We're talking about in-the-dry, open-cut crossings and that's not something the department said we can tolerate even though it's a bad idea for the environment. There's specific findings in the certification that extensive studies show that any effects from them are only temporary and that they are in fact not going to violate state water quality. That's something that FERC held in its original environmental impact statement that EPA did as well. So there's nothing irrational about the department's conclusions here when it came to the particular project before it. And you, I would assume, you would tout the mitigation framework restoration part being the new part that's helpful? I do think that that is the strongest, the most, the clearest example of something that is new and that is helpful. The title I think may be a little bit misleading. Of course it deals with mitigation, which is an important part of the problem, but it also deals with assessing the baseline conditions and setting site-specific performance standards. So I would direct the court to that. I think that is the best example, but that's not the only example. But it's the best example, but it doesn't set out any specific mandatory criteria under oil and gas, does it? Well, certainly the mitigation framework is mandatory. That's condition 26 of the certification. This is not just a voluntary measure. Mandatory in terms of it says compliance with all state and federal law. Well, state and federal law is mandatory, but complying with the particular six-step mitigation framework is a mandatory condition. Under the oil and gas? That's what I asked you. It doesn't, does it? No, no, I'm sorry. Under this certification, this is condition 26 of the 20-21 certification. So it's not something that existed under the general oil and gas permit. So that is something additional that the Department required MVP to comply with going forward that didn't exist before this certification. But ongoing, would you would there be a conflict in the sense of what would apply in terms of ongoing whether the state oil and gas preempts in terms of regulation of pipelines? Is that right? No, Your Honor. I think the preemption argument, that goes to the separate point, if I'm understanding, of whether the Department was required to specifically incorporate the oil and gas permit, the only argument that it would be necessary would be because of this hypothetical preemption concern. But the Department would have very strong arguments that its permit is not preempted because of precisely what you pointed out, FERC's requirement that MVP comply with all applicable state permits. So a highly theoretical preemption argument... Well, the Second Circuit said that wasn't enough, didn't it? Certainly there is some case law that goes the other side on the preemption issue. So you want us to create a circuit split on that issue? I don't, Your Honor. I think this Court only needs to look at what it's held before. But when it comes to what conditions the Department is required to put in, there's a wide degree of discretion there. Of course, the Department could certify with no conditions. The Department has to put the conditions in that it thinks are reasonable or desirable. The Department looked at this and said that we do not have to put this redundant condition in here because MVP already has to comply with this permit. So it's not necessary to explicitly say that again because they knew they were already doing it. The only concern would be preemption. And again, because that's theoretical and the Department would have very strong arguments the Second Circuit is wrong, that's not enough to take it out of the realm of discretion and make it necessary to include. I see I've gone over my time, so unless there are any other questions... Thank you. Mr. Sibley? May it please the Court, George Sibley for Mountain Valley Pipeline. I'd like to first start with petitioner's contention today at the podium that there's no tangible assurance that MVP has changed its ways. That claim is wrong. In response to each of these violations, Mountain Valley was required to submit a corrective action plan. DEP reviewed those plans and they approved them. In each instance, Mountain Valley took corrective action, including in many cases installing additional controls to ensure that there were controls in place to address the issues that had been identified. We provided a list of that in our 28-J response. This contention that Mountain Valley has done nothing in response to these violations is one that appears for the first time in the reply brief, so unfortunately it's not in the joint appendix, but you have it in front of you now in our response to the 28-J letter. That table lists the corrective action that was taken, and in many cases, Mountain Valley is installing additional controls at the direction and under the supervision of the State to address the specific issues that have been identified. It is also... ...speak to Council's argument regarding 401 certification as being arbitrary and capricious because the Department erroneously believed that EPA's construction general permit endorsed the use of the best management practices for in-stream construction. That claim, Your Honor, is one that is the EPA's construction stormwater general permit does not control the specific discharge of dredge or fill material into streams. That much is correct, but the permit does regulate construction activity right up to the water's edge. In addition, that is a passing observation. It is one of several bases on which the agency bases its decision. As my friend noted, during the review process, the agency reviewed scientific studies, not simply those that Mountain Valley provided, those provided by the petitioners as well. Tell me about the position you're taking in your brief, which seems apparent. You're saying that you never believed that the EPA's guidelines applied to in-stream construction, but the record belies that. There's a statement in there where DPA basically says it believed it applied to in-stream construction. And to that I'd like to finish, is that not an inconsistency in the record? That may be incorrect, but that is truly... If you will, I'm not trying to trap you in anything. I'm just asking for facts. Is that an inconsistency? We typically don't like inconsistent statements before the court, whether they're relevant, minor, or whatever, but it is something to represent to us that it doesn't apply, and then the record indicates you do say it applies. Is that not an inconsistency? I would... The stormwater permit does not apply to actual in-stream construction activities. And if that was the only basis on which the agency made their decision, we might have a problem. But it is not. These construction techniques, the actual subject of this certification... I'm simply dealing with the integrity of the process here, and it may not affect it one way or the other. But I just want to be clear that when you come here, you do not make assertions here that are inconsistent in the record. It seems to indicate we don't read the record. And I ask you pointedly, that is an inconsistency. You do acknowledge it, and that's fine. And you can explain how it's... even though it appears to be inconsistent, etc. But when the record itself contains one statement and there's others, it may seem minor to you. We take those things serious because it goes to, I wouldn't say credibility, but it certainly goes into why we need to get hung up on that if that's not something that really needs to be dealt with. In the short time I have left, I may speak to credibility. You will have some time left, but I simply want you to address where I'm going with it. Don't worry about your time here. We're going to give you a fair opportunity to speak. I'm simply saying let's move beyond this and accept it, and then you can move on. Carry on. On credibility, petitioners claim that the mitigation framework is not new. That is wrong. The requirements in the mitigation framework, and Chief Judge Gregory, to your question, they involve requirements that regulate the construction activity itself. It requires Section 3.1 of the Restoration Work Plan, requires continuous monitoring during construction to ensure that the controls put in place are working to prevent the mobilization of sedimentation downstream. That is a new requirement. The requirement to collect baseline data is a new requirement. Petitioners know this because they lament the absence of that data when they discussed the effect of restoration activities at completed crossings. These are new requirements. These are part of the basis on which the agency could draw reasonable assurance that the issues that have occurred in the past, in addition to its ongoing monitoring of the site, to remember... And both of those are during construction as opposed to restoration? Those are during construction, Your Honor. Continuous monitoring, and what was your second one? Continuous monitoring of the requirement of a field meeting before construction commences so that everyone knows exactly what's supposed to be in place. The obligation for people to stop work if controls are not working properly. All of this is in... The Restoration Work Plan is from JA 208 to 221. I urge the Court to read it in its entirety. That is a powerful tool that the agency has put in place. If it's called Restoration Work Plan, it sounds to me like it's during restoration rather than construction and trenching. The label of it probably could have been better. Okay, so it's called Restoration Work Plan, but it really covers everything. Absolutely. What JA site was that? JA 208 to 221. You cannot improve monitoring beyond continuous, and that is the subject of this certification, water quality, the actual stream crossings themselves. Now the agency here relies... The specific question is whether these crossings can be completed consistent with state water quality standards. And there was substantial evidence in the record on which the agency could base that judgment. And you're saying this entire Restoration Work Plan is new? Yes. After the permit? Yes. It was implemented during this permitting process. Petitioners raised the fact that EPA raised concerns and raised comments. This is one of many things that was done to specifically address EPA's comments. So the question is, beyond that Mr. Sidley, is that that may be a change, but the question is compliance and enforcement. While on one hand it includes those things you talked about, the other hand says to the extent, only to the extent it's restoration for compliance. That's why I wonder why these things, why would that language be there? Chief Judge Gregory, I don't know where you're getting that language. I don't know where that's coming from. We are required to comply with this during construction, and if we're not, we're out of compliance. What about after construction in terms of What about after construction in terms of being able to enforce it? Are you sure that the language, you're saying there's nothing in the mitigation framework, there's no language that restricts it in terms of, to the extent it's restoration. Is that your position? Yes. Okay, alright. And post-construction, we have a three-year monitoring obligation using that very data. How long is the pipeline going to be there? To make sure that the crossing, the pipeline is going to be there for decades. So three years is... Again, we're measuring whether the construction, the actual construction activity has been fully restored. Once we've achieved those performance metrics and we've achieved final restoration, you don't need to monitor anymore for water quality standard violations. Certainly that's the judgment. Judge Wynne, if I could, I realize I'm significantly over my time. I'd like to address your question concerning the extent to which the agency explained itself. This Court has repeatedly said that, and indeed this very panel has said, that an agency's failure to address an issue in as great a depth as a panel might like does not render the decision arbitrary or capricious. With respect to Mountain Valley's violations, the agency addressed the question. You cannot say they entirely ignored it. And the evidence shows that Mountain Valley's track record has improved. Now, we unfortunately still had a violation in August. We're driving that number down to zero as best we can. But as conditions occur in the field, that's sometimes difficult to achieve. The agency might have done more to address that. But that does not render the decision arbitrary or capricious. What are the enforcement mechanisms that are included in this 401 certification's conditions? In other words, what happens if you don't do it? Well, we've already seen, one, the state certainly can enforce against us. And because these are made conditions of the certification, they're conditions of the federal permit. So once we get our core permit, the core and EPA can enforce as well. Why would you include compliance as part of the conditions there in these federal permit via the 401 certification? Well, that's ultimately in the discretion of the state to decide whether they think that's necessary. And as my friend has already said, they concluded it was not necessary because they have independent enforcement. How did you get to that conclusion based upon past? Well, because they have enforced. And Mountain Valley has entered a consent order and paid civil penalties in response to those enforcement actions. But look what it took to do it. My question is why wouldn't you put those enforcement mechanisms into the conditions? I don't see how the effort involved, Your Honor, with respect would be any different if it was a condition of the permit. It would create ambiguity about who's responsible for enforcement. And as the state describes in its brief, they wanted to preserve the ability to have that enforcement authority on their own. They have exercised it. Mountain Valley has paid civil penalties in response. That is substantial assurance at such a condition. Making it a condition of the certification is unnecessary. I've vastly exceeded my time. I'm happy to continue in response to any further questions. If not, we would ask that the court dismiss the petition for review. Thank you. Thank you, Your Honors. I'd like to address the mitigation framework just a bit. At JA00210. Are you talking about this restoration work plan? The restoration work plan. The council said it's all new. Right. That's inconsistent with the way the mitigation framework describes itself. At JA, I believe it's 128, MVP explains that its various requirements were scattered amongst many documents. And so the point of the mitigation framework was to bring them all to one place. At JA00210, it says stream and wetland construction and erosion sediment control measures are not addressed in this restoration work plan, except to the extent they specifically pertain to restoration. On the subject of Condition 4, about the use of materials. And that language was in there, correct? That language is in there. Mr. Sibling asked me, I guess, rhetorically, where am I getting that language from? I believe it's from JA00210. I didn't even know where I was getting it from. Go ahead. Condition 4, the project specific condition addressing materials that MVP cannot use. That condition prohibits MVP from using household appliances as fill material. So I don't know that that was ever part of a construction plan. The list of, it seems to be more of a general permit condition that may have come from other permits and isn't project specific. On the topic of continuous monitoring, the 2017 plan, erosion and sediment control plan is in the JA, and it provides that spoil placement and best management practices will be monitored at all times during stream crossing procedures once work within a stream area is started. And it will be conducted continuously to completion. I firmly believe that there's very little new here beyond the requirement that they provide additional compensatory mitigation, which is to pay for damage after it's done. On the question of whether the You're saying that this work restoration, restoration work plan that council cited, the document is new, but what's thrown into it is not new. It existed in some form in various other places for the most part. I believe that to be the case with the exception of that compensatory mitigation, which is new even beyond the new document. MVP described it as a compilation and each time that something new has been presented, it's been able to be found in the prior requirements. Council argues that the reliance on EPA is not sufficient ground for reversal because there were multiple bases, but it is not clear that EPA, I'm sorry, that DEP relied on any particular of its reasons independently and alternatively. And an agency action must be vacated if any of its grounds are infirm, if you're not able to find that independence, and that's the AES Sparrows case cited in our brief. DEP describes in the certification that its reasons must be taken together, so we can't parse them out at this time. Finally, DEP predicted that there would be no violations going forward, going to this question of how many is sufficient. Again, EPA has said that water quality standards must be met at all times. There is no substantial compliance doctrine under the Clean Water Act. DEP predicted no violations going forward, but simultaneously said that on a project of this nature, it expects, it would expect to see violations. In my final minute, I would just like to emphasize that it should be, and the law requires, Section 401D required DEP, once it determined that compliance with the stormwater permit was necessary to meet water quality standards. If it believes that to be the case, that had to become a condition of the 401 Certificate. Counsel for DEP says that preemption was the only reason. Well, we think that's a pretty important reason. We disagree. We think that the stormwater permit is preempted, but there is another important reason as well. Congress intended for these conditions to become part of the 401 Certification to be sure that there are multiple enforcers involved so that, you know, if it is preempted, then the Corps or FERC could enforce if it becomes a condition of the federal permit. Importantly, Congress also recognized, and this Court has echoed that in the Piney Run decision, that citizen enforcement is an important component under the Clean Water Act, and conditions of 401 Certificates are enforceable in citizen suits. By leaving it out, not only does DEP expose its stormwater permit to the risk of preemption, it also short-circuits the various enforcement mechanisms that Congress intended. Unless there are any further questions, thank you very much. Thank you, Counsel. Thank you all, and we appreciate your arguments and your assistance in these difficult cases, and we would love to come down and greet you in our normal Fourth Circuit tradition, but we, under circumstances we can't do that, but know very much that we appreciate you, and we thank you so much.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker